# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS
# WESTERN DIVISION

```
_____
                                )
In re:                          )        Chapter 13
                                )        Case No. 10-31324-HJB
        JOSE LUIS CLAUDIO, SR., )
                                )
                Debtor          )
_____)
```

### MEMORANDUM OF DECISION

Before the Court is an "Application for Approval of Debtor's Counsel's Fees and Expenses" (the "Fee Application") and an "Amendment" to the Fee Application (the "Amendment") (together, the "Amended Fee Application") filed by Attorney L. Jed Berliner ("Attorney Berliner"), counsel to Jose Luis Claudio, Sr., the debtor in this Chapter 13 bankruptcy case (the "Debtor"). In the Amended Fee Application, Attorney Berliner seeks allowance of compensation in the total amount of $7,967, calculated as $7,847 for fees and $1,034.10 for expenses,[1] less a voluntary fee reduction of $914.10.[2] Because Attorney Berliner has received the sum of $4,467 from the Debtor prior to filing this case, he seeks allowance of the remainder ($3,500) as an administrative expense to be paid through Debtor's Chapter 13 plan. For the reasons set forth below, the Amended Fee Application will be

---

[1] The request for allowance of $1,034.10 for reimbursement of expenses is misleading. A careful review of Exhibit D to the Fee Application (as well as a reading of Amendment) reveals that those expenses include a $500 "[e]stimate for postconfirmation services." Fee Appl. Ex. D, at 20, ECF No. 75; Amend. to Fee Appl., at 6, ¶ 13, ECF No. 98. That sum should not have been included in a list reserved for out-of-pocket expenses, and Attorney Berliner is directed to refrain from including that line item in any requests for expense reimbursements in the future.

[2] The narrative portion of the Amended Fee Application does not state the time period for which compensation is requested. The Court will adopt the time frame covered in the attached time records: June 10, 2010 through May 3, 2011.

allowed in the total amount of $4,034.10, with no additional amounts to be paid under the Chapter 13 plan and the excess $432.90 to be held by Attorney Berliner and disbursed to Attorney Berliner only in the event that he renders additional unpaid services to the Debtor; otherwise the remainder shall be disbursed to the Chapter 13 trustee.

## I.    FACTS AND TRAVEL OF THE CASE

The Debtor filed his voluntary petition under Chapter 13 of the United States Bankruptcy Code (the "Bankruptcy Code" or the "Code")[3] on June 30, 2010.  On that day, the Debtor also filed, *inter alia*, the disclosure of attorney compensation required by Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules") 2016(b), and the form engagement agreement between the Debtor and Attorney Berliner required by Massachusetts Local Bankruptcy Rule ("MLBR") 13-2(a)(1)(A)(ii), see MLBR Official Local Form 8 (the "Official Chapter 13 Agreement").  Attached to the Official Chapter 13 Agreement was an individualized Chapter 13 retainer agreement drafted by Attorney Berliner and signed by the Debtor (the "Retainer Agreement").

The Retainer Agreement states that the Debtor agreed to pay for Attorney Berliner's representation in this Chapter 13 case the greater of: (1) $4,000 (to be deposited in advance of the representation); or (2) an hourly rate based on Attorney Berliner's "usual and customary rates [then] set at $265 for [Attorney Berliner] and lesser for staff, plus costs."  Retainer Agreement, ECF No. 1.  Those costs, also required to be paid in advance, were estimated in the amount of $467.  Accordingly, the Debtor was required to pay to Attorney Berliner the total

---

[3] See 11 U.S.C. § 101 et seq.  All references to statutory sections are to the Bankruptcy Code unless otherwise specified.

amount of $4,467 to secure his representation.[4]   The Retainer Agreement also provided that

Attorney Berliner would be paid

> reasonable costs the [sic] greater of hourly fees or 45% of the total recovery, including any court attorney fee award, for (1) any asset taken from [the Debtor] before the bankruptcy filing which [Attorney Berliner] recover[ed], and (2) a creditor's violations of bankruptcy or other consumer protection laws.[5]

Id. Finally, the Retainer Agreement contained a curious handwritten insert to the effect that the

"commitment to represent depends on when retainer is available *and my schedule*."   Id.

(emphasis supplied).

On July 13, 2010, Attorney Berliner filed the Debtor's required schedules and

statements (the "Schedules").   They reflected the Debtor's financial distress, but not any

particular legal complexity.   The Debtor was the sole owner of his home, which the Debtor

valued at $164,500.   The property was encumbered by a mortgage held by US Bank Home

Mortgage (the "Bank") securing a balance of $196,608.   The Debtor's personal property was

similarly unremarkable with a total value in the amount of $6,935.88,[6] within the applicable

exemptions provided by § 522(d) of the Bankruptcy Code.   On Schedule I, the Debtor

represented himself as divorced with no dependents, and reported total average monthly

---

[4] See Retainer Agreement ("I am not your lawyer unless retainer . . . rec'd w/in 30 days").

[5] Although the propriety of this particular provision is not now before the Court, the likelihood that this Court would approve a contingent fee award of this type is best described as "poor."

[6] The Debtor's personal property included a 2006 Mitsubishi Gallant automobile, which the Debtor valued at $4,050, but which was subject to a security interest in the amount of $16,570.   In addition, Schedule B included the following provision under the category of "Other contingent and unliquidated claims of every nature . . ." (Item 21):

> Possible consumer protection causes of action against pending or past mortgagees and/or mortgage brokers for statutory, actual, and punitive damages and attorney fees, and/or a continued right of rescission; not investigated.

Schedule B, at 2, ECF No. 12.   The latter "asset" was not assigned a value on Schedule B, was not exempted on Schedule C, and appears not to have been acted upon or further acknowledged during the course of the case.

3

income of $5,192.56, inclusive of monthly household contributions from his "partner." Schedule I, at 1, ECF. No. 12.   His monthly expenses, set forth in reasonable detail on Schedule J, totaled $4,644.47.   Accordingly, the Debtor reported monthly net disposable income of $548.09.

Simultaneous with the filing of his Schedules on July 13, 2010, the Debtor filed his Chapter 13 Plan and Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income ("Form B22C").   On Form B22C, as required by §§ 1325(b)(3) and (4), the Debtor compared his annualized current monthly income to the median family income, but for a family of 7 persons.   In an attachment to Form B22C, the Debtor explained that his household consisted of the "debtor, debtor's partner . . . ; debtor's minor stepdaughter . . . ; debtor's stepson . . . ; debtor's minor godson . . .; debtor's minor niece . . . ; and debtor's minor nephew . . . ."   Form B22C, Attach. A, ECF No.13.

On September 8, 2010, the Debtor filed amended Schedules I and J.   Amended Schedule I eliminated a payroll deduction set forth on the original schedule relating to a student loan repayment "which had ceased just prior to filing."   Amend. Sched. I & J, at Amend. Cover Sheet, ECF No. 20.   Amended Schedule J "re-allocate[d]" and increased his reported expenses, so that his net disposable income was not changed.   Id.   The Debtor also now included on Amended Schedule I those with whom he shared his home.   But the Debtor's relationship to each of those added persons was partially inconsistent with those set forth on Form B22C.   The person identified on Form B22C as the Debtor's "partner" was now designated as his "girlfriend," and the persons represented as the Debtor's "stepson" and "stepdaughter" were now designated as the son and the daughter, respectively, of the Debtor's

4

girlfriend, and not the Debtor's stepchildren.[7]

The Chapter 13 plan filed on July 13, 2010 (the "Chapter 13 Plan" or the "Plan") was fairly typical in its provisions for creditors. The Debtor proposed to cure arrearages in the amount of $20,000 on his home mortgage and to bifurcate his automobile loan, paying $7,011.95 on account of the secured portion of the claim. The Debtor's monthly plan payment in the amount of $550 approximated his net disposable income shown on the original (and later amended) Schedule J. That monthly payment, to be made over a period of 55 months, was to be allocated first to cure the arrears on the secured debt and to pay the secured portion of the automobile loan, then to the Chapter 13 trustee's fees, and the remainder to unsecured creditors. This yielded an estimated dividend to unsecured creditors (depending on timely-filed claims) of 1.8029 percent. The Plan did not include an administrative claim for further attorney's fees.

The Chapter 13 trustee, however, was dissatisfied with the Chapter 13 Plan and filed an objection on September 10, 2010 (the "Objection to Plan"). In that objection (filed prior to the Debtor's Amended Schedules I and J), she complained of the wage deduction for the student loan payment, income which she argued should inure to the benefit of unsecured creditors. In addition, she objected to certain additional provisions inserted in the Plan by which the Debtor, *inter alia*, (i) attempted to fix the amount of the secured claims in the Plan itself before the expiration of the deadline for filing proofs of claim and (ii) declared that all payments on secured debt would be deemed current as of the date of the Debtor's discharge (together, the

---

[7] For purposes of applying the so-called "means test" under §§ 1325(b)(3) and (4), these distinctions may be of little moment, but they are nonetheless notable (as is the complete absence of these persons in the Debtor's original Schedule I) in light of Attorney Berliner's statements in the Amended Fee Application regarding the extraordinary level of attention he gave to the Debtor.

"Additional Provisions").[8]    The Chapter 13 trustee asserted that those provisions were

procedurally improper, and in any event premature, and that the first provision violated

previous case law in this District.  See In re Christopher Ryan, Case No. 08-40601-MSH, Slip

Op. (Bankr. D. Mass. July 21, 2010) (while the order confirming the Chapter 13 plan is *res*

*judicata* as to the treatment of a prepetition arrearage claim, the determination of the amount of

such claim occurs as part of the claims allowance and objection process); see also In re

Greene–Jackson, Case No. 00–14423–JNF, Slip Op. (Bankr. D. Mass. Mar. 30, 2001).[9]

At a hearing on the Chapter 13 trustee's Objection to Plan held on October 19, 2010,

the parties reported that all was settled between them (with the resolution to be presented in

an amended plan), excepting only the question of whether a debtor could fix the amount of a

secured creditor's claim in a Chapter 13 plan prior to the expiration of the deadline for filing

proofs of claim.   Noting that it had previously taken the same issue under advisement in

another case, see In Re Euliano, 442 B.R. 177 (Bankr. D. Mass. 2010), the resolution of which

would be dispositive here, the Court took the Objection to Plan under advisement, but did not

request any additional briefing in this case.

The Court issued its decision in Euliano on November 30, 2010 and held therein that

the amount of a secured creditor's arrearage claim listed in a debtor's Chapter 13 plan "cannot

be preclusive as to the *amount* of the claim where the deadline to file a claim postdates

confirmation of the plan."   442 B.R. at 189.   Consistent with that holding, the Court sustained

the Chapter 13 trustee's Objection to Plan in this case and ordered the Debtor to file an

---

[8] The Additional Provisions were included in Part IVB of the Debtor's Chapter 13 plan under the heading "Miscellaneous Provisions."

[9] The Chapter 13 trustee also found the Additional Provision describing the plan as a "pot plan" disturbing, but ultimately decided not to press that argument.  It must be noted, however, that the failure of the Chapter 13 trustee to object to any of the other provisions listed there and the fact that Court has not addressed them ought not to be interpreted as the Court's approval of their language or substance.

amended plan within 30 days.

After requesting and receiving an extension of time, the Debtor ultimately filed his amended Chapter 13 plan on February 11, 2011 (the "First Amended Plan").[10]  The First Amended Plan was identical to the original plan, excepting only a revision of the Additional Provisions.  Otherwise, the amendments represented no substantive change.  The Debtor still proposed to pay $550 per month to the Chapter 13 trustee, the dividend to unsecured creditors remained estimated at 1.8029 percent (again, dependent on the amount of timely-filed claims), the total to be paid to secured creditors was left unchanged, and no administrative claim for further attorney's fees was set forth.

Thereafter, the Debtor (presumably relying on the procedural admonition of <u>Euliano</u>) objected to two claims filed by the Bank purporting to hold the mortgage on the Debtor's residence and objected to the claim filed by CitiFinancial Auto Corporation ("CitiFinancial"), the holder of a security interest in his automobile.  The Debtor objected to the claims of the Bank because they appeared to be duplicates and on further grounds associated with their preparation and some of the Bank's charges.  The Debtor objected to CitiFinancial's claim on grounds that the secured claim should have been reduced to the value of the automobile[11] and again on various grounds associated with the claim's preparation.

In response, the Bank withdrew one of the duplicate proofs of claim, and the remaining objections were scheduled for hearing on March 31, 2011.  Prior to the hearing, however, the Debtor resolved his dispute with CitiFinancial and withdrew his objection, conditioned upon the

---

[10] This First Amended Plan was accompanied by an "Amendment" to Schedules I and J, but the filed attached schedules were identical in every respect to the Amended Schedules I and J filed on September 8, 2010.

[11] The objection also included a not-so-veiled threat that the lender's failure to properly divide its claims into secured and undersecured components might expose the claimant to criminal prosecution upon the submission of a fraudulent claim.

CitiFinancial's agreement to file an amended claim for a reduced amount.  At the hearing, the Court addressed the sole remaining objection to the Bank's claim, ordered the Bank to provide Attorney Berliner with documentary evidence sufficient to establish its standing not later than April 15, 2011, and continued the hearing to May 5, 2011.  Two days before the continued hearing, however, the Debtor filed an expedited request to cancel the hearing.  In that request, the Debtor reported that, after a full review, the Debtor and the Bank agreed that the claim should be reduced by the sum of $962.68[12] and that the claim was otherwise appropriate.  The motion was granted and the hearing set for May 5, 2011 was canceled.

The next day, May 4, 2011, the Debtor filed a further amended Chapter 13 plan (the "Second Amended Plan").  The Second Amended Plan largely contained relatively minor adjustments.  The Debtor still proposed a $550 per month plan payment, the plan term was reduced from 55 months to 48 months, the arrearage on the mortgage was now established as the amount contained in the Bank's amended claim ($28,020.64), and the reported dividend to unsecured creditors increased to 7.9205 percent based on the filed claims (the claims bar date having passed).

Notably, however, the Second Amended Plan inserted an administrative claim for Attorney Berliner's fees in the amount of $3,500 (not including, and in addition to, the $4,467 retainer already received).  The Second Amended Plan was confirmed by the Court on August 3, 2011, with the reservation that the Chapter 13 trustee would not disburse any funds to Attorney Berliner for attorney's fees absent further Court order.[13]

---

[12] The Bank's claim was reduced by $780 for contested property inspection fees and $182.68 for a contested escrow advance.

[13] Attorney Berliner was required to receive Court approval of those fees pursuant to MLBR 13-7(c), which provides:

Attorney Berliner filed his Fee Application on May 4, 2011 (in conjunction with the filing of the Second Amended Plan); the application was taken under advisement on May 16, 2011. On more careful review of the Fee Application, the Court found it difficult to square the detail of services provided with either the progress of the case as reflected in the docket or the narrative description of those services (described more fully below).  Accordingly, on May 18, 2011, the Court issued the following order:

> ON MAY 16, 2011, THIS COURT TOOK THE "APPLICATION FOR APPROVAL OF DEBTOR'S COUNSEL'S FEES AND EXPENSES" UNDER ADVISEMENT.  IN ORDER TO FACILITATE THE COURT'S CONSIDERATION OF THE APPLICATION, ACTION THEREON WILL BE DEFERRED PENDING COMPLIANCE BY DEBTOR'S COUNSEL WITH THE FOLLOWING:  ON OR BEFORE JUNE 17, 2011, COUNSEL FOR THE DEBTOR SHALL FILE 1) A STATEMENT AS TO WHETHER HE WISHES THE COURT TO SCHEDULE AN EVIDENTIARY HEAIRNG ON THE APPLICATION OR WHETHER ANY RIGHT TO AN EVIDENTIARY HEARING IS WAIVED; AND 2) IN LIGHT OF THE LENGTH AND COMPLEXITY OF THE SERVICES DESCRIBED IN PARAGRAPH 10 AND EXHIBITS "C" AND "D" OF THE APPLICATION, AMEND THE APPLICATION TO PROVIDE THE INFORMATION AND STRUCTURE SET FORTH IN MASSACHUSETTS LOCAL BANKRUPTCY RULE 2016-1(d)(1) AND (2) WITH SPECIFIC REFERENCE TO THE APPLICABLE CATEGORIES OF SERVICES REFERENCED BY THE APPLICANT IN PARAGRAPH 10 OF THE APPLICATION.    THE FAILURE OF THE APPLICANT TO FILE THE REQUESTED STATEMENT SHALL BE DEEMED A WAIVER OF HIS RIGHT, IF ANY, TO AN EVIDENTIARY HEARING.  THE FAILURE OF THE APPLICANT TO SUPPLY THE REQUESTED INFORMATION SHALL RESULT IN ALLOWANCE OF THE APPLICATION IN THE AMOUNT OF $3,500.

Order Regarding Fee Application, ECF No. 86 (the "May 18 Order").  On June 17, 2011, Attorney Berliner filed a "Waiver of Evidentiary Hearing," in which he stated: "Fee applicant, debtor's counsel, appreciates and waives the Court's invitation to request an evidentiary

---

Application for Additional Attorney's Fees.  An attorney who proposes to charge a debtor more than $3,500 in the aggregate for legal services in a chapter 13 case prior to confirmation, or $500 in the aggregate for such services after confirmation, shall file an application for compensation in accordance with Fed. R. Bankr. P. 2016 and MLBR 2016-1.

See also the Court's remarks, infra, at note 15.

hearing as stated in its May 18, 2011 order." On July 1, 2011 – after requesting and receiving

two extensions of the deadline to amend the Fee Application – Attorney Berliner filed the

required Amendment to the Fee Application,[14] which Amendment and Fee Application

comprise the Amended Fee Application presently before the Court.


II.    THE AMENDED FEE APPLICATION, ITS CONTENTS, AND ATTORNEY BERLINER'S
       CHARACTERIZATION OF HIS SERVICES

       In the original Fee Application filed on May 4, 2011, Attorney Berliner wasted no time in

acknowledging what he assumed would likely be the Court's concern with the request for

additional fees. In the second paragraph, Attorney Berliner advises:

> Fees in this case are higher than ordinarily expected due to (1) the need for
> preparation of three plans to accommodate the trustee's unsuccessful objection
> to pot plan language and her successful objections to self-adjusting payments
> intended to accommodate post-confirmation allowance of administrative
> expenses and to incomplete treatment of mortgage arrears, (2) the detailed
> review and successful adjustments to the secured claims a [sic] modest $800 for
> the mortgage arrears – where the outcome could not be predicted at the outset of
> the investigation – and a substantial $10,000 savings on the bifurcated motor
> vehicle claim.

Fee Appl., at 1, ¶ 2.

       Attorney Berliner then addressed the general standards established for evaluating an

attorney's fee application, including the applicable statutory provisions, Bankruptcy Rules,

Massachusetts Local Bankruptcy Rules, and case law. But with respect to the particular

services that he provided, the flavor of Attorney Berliner's description is best tasted in his own

words:

---

[14] On July 12, 2011, Attorney Berliner filed a "Motion for Advance Notice of Court's Concerns on Fee
Application and for Non-Evidentiary Hearing Opportunity Thereon." In light of the detail provided by
Attorney Berliner in the Amended Fee Application which the Court would, of necessity, carefully review,
the Court appreciated, but waived the invitation to hear oral argument and denied the motion. See
MLBR 9013-1(e) ("The Court may act upon a motion without a hearing under appropriate
circumstances . . .").

Counsel does not know of any other attorney whose practice is limited to consumer debtors, nor is he aware of any other attorney in his region who provides the full range of services he does:

a.   A letter is written to each creditor as soon as practical to stop harassing telephone calls pursuant to the Fair Debt Collection Practices Act and GLM [sic] chapter 93, section 49.

b.   Counsel, a 30-year experienced practitioner, is intimately involved in all phases, developments, and services for each case.  No matter is handed off to minimally supervised staff.  His extensive experience allows him the knowledge of where most of the issues will arise, and his multiple redundancy systems ultimately insure the filing and presentation of the most accurate schedules and statements possible.

c.   A 14 page comprehensive brochure, form retainer agreement, and four page consultation questionnaire is presented to every prospective client before any consultation, with sufficient time for review beforehand.

d.   Each consultation is unlimited in time and includes close scrutiny of all circumstances and an answer to each question presented.

e.   Once retained, information is gathered from each of the three prominent credit reporting agencies, plus a national public records search for law suits, to insure that every debt is scheduled and discharged if possible. Cf. *Colonial Surety Company v. Weitzman*, 564 F.3d 526 (1st Cir. 2009) (unscheduled debts are not discharged).  This eases the work of his clients, as they do not have to create the original list of creditors but instead only have to update and supplement the information in the four reports.

f.   The client then comes in for a more-detailed 12 page worksheet appointment, which often leads to additional information not recalled for the first consultation.  These appointments last as long as four hours, including about an hour for budgeting so the income and schedules are truthful. (Even with Chapter 7 cases, counsel requires stated income and expenses to match to the penny unless the client is truly saving or borrowing money in the representative month.  There are only those three alternatives to how income and expenses relate in the average month: a surplus-savings, a deficit-borrowing, or an exact match.  A higher expense in one category, perhaps car repairs, is offset by a reduction in another, perhaps by lowering food from hamburger to macaroni and cheese. Accurate original income and expense schedules raise the accuracy standards for all his filed schedules and statements, and avoid trustee confusion and inappropriate disputes postfiling.)

i. [sic] Counsel's staff performs at least two title searches for the residential county to assure having the latest information about transfers, gifts, and liens, the first for the worksheet appointment and the second just before filing.  Oftentimes an earlier, uncompensated search is performed before the consultation to avoid unpleasant surprises and distrust after being retained.

g. [sic] A national asset database search is obtained to insure that the schedules are as accurate as possible and avoids problems from a client overlooking a motor vehicle, a campground, or a surprise remainder interest in a distant parent's home.

h. [sic] If a means test is required, it is performed as many times as necessary to insure that the lowest possible, but legal, monthly payment is required of the debtor.  This might mean, for example, paying careful attention to pay periods so the amount of biweekly three paycheck months during the six month lookback period is minimized.  It usually means requiring a mid-year *pro forma* tax return if there are tax event changes from the previous year, as well as other lawful suggestions to achieve the best possible results.

l. [sic] Draft papers are prepared and mailed to the client so they may be reviewed in the comfort and more-relaxed atmosphere of their own home, this being the third opportunity for a client to think of overlooked items.

K. [sic] A fee-paying chapter 13 filing had been offered to clients in appropriate circumstances so they may promptly obtain the benefits of an automatic stay and stop law suits and unreasonable harassment if chapter 7 is not affordable.   This opportunity has been suspended pending appellate review.

l.  Counsel selects a nationally-renown credit counselor, in business since 2001 before BAPCPA, for his clients.  He registers them for the required prepetition and postpetition programs, and includes those costs in his overall retainer.  This minimizes the additional stress and work of a client having to perform her own investigation of program providers and then be surprised at an additional, undisclosed cost for a bankruptcy filing.

m.  Counsel is extremely vigilant about enforcing the automatic stay protections for his client, having done so long before the First Circuit approved emotional distress as a factor of recovery and to the point where this Court once commented that it "had long tolerated counsel's cottage industry until now."

n.  Counsel works with his clients after the bankruptcy case is closed to insure that updated post-discharge credit reports do not contain stale,

damaging information.

o.    Full lifetime support is provided for representation in the event of concerns
      raised which are related to a bankruptcy filing.

p.    Counsel surveys each client at the conclusion of representation to learn of
      ways to improve his services.  He then publishes the results (redacting the
      client's name, of course) so his clients can see for themselves what other
      clients think of counsel and his staff.  Counsel knows of no other attorney
      in the region who surveys his clients, never mind publishing the results.

Fee Appl., at 4-6, ¶ 10.

The Amendment supplies the information requested by the Court in its May 18 Order,

as well as a narrative raising additional issues.   It displays great annoyance with the

suggestion in the May 18 Order that the failure to comply would result in an allowance of only

$3,500 in attorney's fees, thereby denying Attorney Berliner allowance of his out-of-pocket

costs (a fair criticism) and the additional $500 for postconfirmation services (less than a fair

criticism).[15]  But the essence of the Amendment is best summarized in its Paragraph 4:

The overall inquiry is why applicant's services are notably higher than the
presumptive amount.[16] In sum, the response is:

(1) the need for a First Amended Plan and Amended Schedules I and J,
    where a payroll deduction was short-term but not explained by the
    debtor to applicant in the context of a need for an emergency filing
    within 48 hours of being retained to avoid a foreclosure,

(2) the need for a Second Amended Plan and Amended Schedules I and J
    where the Court ruled against some of the proposed additional

---

[15]  Attorney Berliner's argument regarding the $500 "estimate" for postpetition services is easily
dispatched.  The Fee Application was filed prior to confirmation of any Chapter 13 plan.  MLBR 13-7
provides that a charge of $500 for postconfirmation services will not require the filing of a fee
application if the charge for *preconfirmation* services does not exceed $3,500.  Attorney Berliner reads
the local rule to permit an attorney to charge a total fee of $4,000 *prior* to confirmation with the
assumption that postconfirmation services will be necessary. This Court disagrees.  It reads the rule as
permitting an additional $500 to be charged for postconfirmation services *if and when* the need for
postconfirmation services ever arises.

[16]  The Court assumes that the term "presumptive amount" is again a reference to the amount set forth
in MLBR 13-7.

provisions for the plan in this and in other cases (combining the five cases allowed for prorationing [sic] of the services over all the cases), and

(3) the need to investigate, in great detail, the 40% increase in the mortgagee's $28,000 of asserted arrears which was $8,000 greater than the debtor's $20,000 estimate, especially in the context of a United States Trustee report of inflated mortgagee claims in many Chapter 13 cases.

Amend. to Fee Appl., at 2, ¶ 4.


III.    DISCUSSION

    A.    **Applicable Standards for Compensation in Chapter 13 Cases**

In the case of <u>In re LaFrance</u>, 311 B.R. 1 (Bankr. D. Mass. 2004), this Court had occasion to discuss at length the legal standards which should be employed to evaluate fee applications filed by debtor's counsel in Chapter 13 cases:[17]

> The standards for allowance of compensation to professionals generally are set forth in § 330 of the Bankruptcy Code.  11 U.S.C. § 330 (2004).  With respect to Chapter 13 cases, § 330 specifically provides:
>
>> In a . . . chapter 13 case in which the debtor is an individual, the court may allow reasonable compensation to the debtor's attorney for representing the interests of the debtor in connection with the bankruptcy case based on a consideration of the benefit and necessity of such services to the debtor and the other factors set forth in this section.

11 U.S.C. §330(a)(4)(B) (2004).

> And §330 further instructs with respect to compensation under any chapter:
>
>> In determining the amount of reasonable compensation to be

---

[17] The Court's <u>LaFrance</u> decision requires minor updating, but its tenor has retained continued validity. Changes are footnoted in the following excerpt.  The Court is also mindful that the issues before the Court in <u>LaFrance</u> related to an attorney who had done considerably less than was necessary in representing his clients, while the issue before the Court here is whether some of the services rendered by Attorney Berliner were redundant or otherwise unnecessary.

awarded,[18] the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.[19]

11 U.S.C. §330(a)(3) (2004).

In this Circuit, the methodology employed to evaluate the reasonableness of compensation for professionals is the "lodestar" approach.  See Boston and Maine Corp. v. Moore, 776 F.2d 2, 6-7 (1st Cir.1985); Furtado v. Bishop, 635 F.2d 915, 920 (1st Cir.1980); Garb v. Marshall (In re Narragansett Clothing Company), 210 B.R. 493, 497 (1st Cir. BAP 1997); In re Bank of New England Corp., 142 B.R. 584, 586 (D. Mass. 1992); In re ACT Manufacturing, 281 B.R. 468, 479 (Bankr. D. Mass. 2002); In re Anolik, 207 B.R. 34, n.11 (Bankr. D. Mass.1997); In re 1095 Commonwealth Ave. Corp., 204 B.R. 284, 290 (Bankr. D. Mass. 1997); In re Smuggler's Beach Properties, Inc., 149 B.R. 740, 743 (Bankr. D. Mass. 1993); In re First Software Corp., 79 B.R. 108, 112-13 (Bankr. D. Mass.1987); In re WHET, Inc., 58 B.R. 278, 285 (Bankr. D. Mass.1986).  Courts first develop a point of reference by determining a reasonable billing rate and then multiplying it by the number of hours which appropriate tasks should have consumed.  Narragansett Clothing Company, 210 B.R. at 497.

---

[18] This subsection was amended in 2005 to read "awarded to an examiner, trustee under chapter 11, or professional person . . . ."  See Bankruptcy Abuse Prevention & Consumer Protection Act of 2005 ("BAPCPA"), PL 109-8, Title IV, sec. 407(1), 119 Stat. 106.

[19] In 2005, BAPCPA redesignated subsection (E) as (F) and added a new subsection (E), which provides: "with respect to a processional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field."  See BAPCPA, PL 109-8, Title IV, sec. 415, 119 Stat. 107.

The lodestar rate ought to take into account the type of work performed, who performed it, the expertise that it required, and when it was undertaken. Grendel's Den, Inc. v. Larkin, 749 F.2d 945, 950-51 (1st Cir. 1984). The court must "consider prevailing market rates in determining the lodestar, based on usual and customary rates in the jurisdiction . . . . No presumption exists that a professional is entitled to the amount he or she requests." Narragansett Clothing Company, 210 B.R. at 498-99. Once determined, the applicable rate is multiplied by the hours reported, after those which are duplicative, unproductive, excessive, or otherwise unnecessary are subtracted. Grendel's Den, Inc. v. Larkin, 749 F.2d at 950.

Finally, the lodestar is adjusted by various factors, including:

(1) the time and labor required; (2) the novelty and difficulty of the questions presented by the case; (3) the skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time pressures imposed by the client or the circumstances; (8) the amount involved and results obtained as a result of the attorney's services; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. Smuggler's Beach Properties, Inc., 149 B.R. at 743; In re First Software Corporation at 112.

Anolik, 207 B.R. at n.11.

The Court has an independent judicial responsibility to review the fees of professionals, even in the absence of an objection by a party in interest. In re First Software Corporation, 149 B.R. at 111. The burden of proof is on the party requesting a compensation award. Narragansett Clothing Company 210 B.R. at 498. Where no evidence is presented to establish the customary rate, the court must rely "upon its own expertise in judging market rates for professionals in the jurisdiction in which it sits." Id. at 499.

Measuring proper compensation in Chapter 13 cases presents special challenges. Section 330(a)(4)(B) specifically directs the Court's attention to the welfare of the debtor rather than that of the bankruptcy estate. 11 U.S.C. §330(a)(4)(B) (2004). Furthermore, the economics of practice under Chapter 13 is different from those under Chapters 7 or 11. In Chapter 7 cases, counsel to

the individual debtor is paid by the debtor, but is likely to be confronted with a finite set of problems (e.g., relating to exemptions and discharge) to be overcome within a rather limited period of time.  In Chapter 11 cases, counsel to the debtor in possession may be called upon to perform extensive services, but can be paid from funds of the estate.  See Lamie v. United States Trustee, 540 U.S. 526, 124 S. Ct. 1023, 157 L.Ed.2d 1024 (2004); 11 U.S.C. § 1106; §327.  But in Chapter 13, while the amount of available funds to pay for services may be small, the debtor's needs may be extensive.  Proper representation of a Chapter 13 debtor requires the time and patience to identify the source of the debtor's financial difficulty in order to draft a reorganization plan that best addresses the debtor's problems.  Once drafted, the reorganization plan may have to be negotiated with creditors and the Chapter 13 trustee, and may have to be amended, sometimes more than one time.  Disputes as to the propriety of the plan's terms may spill out into the courtroom; and, once disputes are resolved, further plan modification may be required in order to achieve confirmation.  And after all of that, the debtor may default and require further legal assistance.  Plan defaults, as well as defaults in the monthly payment of home mortgages, are commonplace.

The resources available to fund the typical Chapter 13 case come from the Chapter 13 debtor, an individual with a self-evident inability to raise substantial funds.  The economics of a Chapter 13 practice therefore require that counsel to the Chapter 13 debtor use appropriate techniques in order to reduce the costs of doing business.  The development of a practice with some measure of volume is commonplace; the employment of paralegals to reduce the average billable rate and the introduction of computer technology to reduce work time is often a necessity.  Yet all of the business efficiencies must be fashioned so that they do not interfere with the high quality of legal services which Chapter 13 debtors deserve and the bankruptcy courts expect of all attorneys who practice before them.

The focus that § 330(a)(4)(B) places upon the benefit of legal services to the Chapter 13 debtor, together with the unique economics of the Chapter 13 practice, has encouraged courts to seek efficiencies as well.   While not abandoning the lodestar methodology entirely, some courts have adopted a "no look", "presumptive" or "initial fixed" fee standard to be applied to the "routine tasks" attendant to most Chapter 13 cases.  See, e.g., In re Eliapo, 298 B.R. 392, 399-400 (9th Cir. BAP 2003) (collecting cases); In re Argento, 282 B.R. 108, 116-17 (Bankr. D. Mass. 2002); see also, Keith M. Lundin, Chapter 13 Bankruptcy, 3d Ed., Debtors' Attorney's Fees § 294-18 - 294-24.  Typically, this method assumes that tasks common to all Chapter 13 cases will be covered by a standard fee

promulgated in a local rule or guideline.   Additional services relating to any unique complexities of the case are then measured through some variant of the lodestar methodology.

The bankruptcy judges in the District of Massachusetts have retained the lodestar approach in evaluating fees for services rendered to debtors in Chapter 13 cases and have chosen not to adopt a fixed or presumptive fee.   Often misunderstood, MLRB 13-7(b) is a rule of procedure rather than one of substance.  It provides:

> Unless otherwise ordered by the Court, if debtor's counsel's total compensation prior to confirmation of a plan is $2,500 or less, the disclosure of the compensation in the Rule 2016(b) Statement shall be sufficient notwithstanding compensation for post confirmation services in amount not exceeding $500, and the filing of an itemized application for compensation shall be excused, unless the Court orders otherwise.[20]

The message of Rule 13-7(b) is clear: if the fees of counsel to the debtor in a Chapter 13 case do not exceed $2,500 for prepetition services and $500 for postpetition services, then the attorney need neither amend a lesser disclosure in the attorney's Fed. R. Bankr. P. 2016(b) Statement, nor file a fee application in order to be entitled to payment - unless the Court orders differently.   The assumption underlying Rule 13-7(b) is <u>not</u> that $3,000 is some form of floor or ceiling for appropriate compensation for debtor's counsel in a Chapter 13 case. Rather, the rule recognizes that it is so unlikely that the Court will disallow compensation of $3,000 or less when an attorney renders beneficial legal services to a Chapter 13 debtor that the preparation of a fee application would waste judicial resources and drive up costs to a debtor whose funds are better spent on a dividend to creditors.  The Rule contains the fail-safe clause "[u]nless otherwise ordered by the Court" in order to ensure its underlying premise: that Rule 13-7(b) should have effect only where the Court believes it likely that the debtor receive beneficial services from debtor's counsel.

<u>LaFrance</u>, 311 B.R. at 19-22.

The last quoted paragraph of the <u>LaFrance</u> decision suggests that a clarification is in

---

[20] As earlier indicated, the Judges of this District have since amended MLBR 13-7 to accommodate for the effect on legal practice of the 2005 amendments to the Bankruptcy Code.  The current version of MLBR 13-7 substitutes the "$3,500" for "$2,500" in relation to prepetition services, while the $500 postpetition service fee has remained unchanged.  Accordingly, the reference to "$3,000" in the following paragraph would, if drafted today, read "$4,000."

order.  Earlier in the decision, the Court commented that "[t]he resources available to fund the typical Chapter 13 case come from the Chapter 13 debtor, an individual with a self-evident inability to raise substantial funds."  Id. at 21.  That much is true.  Unsaid there, however, is a circumstance common to almost all Chapter 13 cases: unless the dividend to creditors represents payment of their claims in full, the funds available for distribution is generally fixed by the debtor's disposable income; accordingly, the compensation paid to debtor's counsel through the Chapter 13 plan represents funds that otherwise would have been available to pay creditors.  Therefore, payment to debtor's counsel of an amount beyond what is appropriate does not affect the debtor, but robs the *creditors* of those otherwise available funds.

## B.    The Amended Fee Application

Evaluation of the Amended Fee Application begins with the lodestar analysis, adjusted to fit the circumstances.  The first task is to identify the appropriate billing rate for debtor's counsel.  Notwithstanding the somewhat cloying puffery with which Attorney Berliner describes his abilities and the quality of his services, this Court recognizes Attorney Berliner as an experienced attorney who has demonstrated, over an extended period of time, the ability to render the services which his clients require in order to enjoy the benefits of the Bankruptcy Code.  The Court does not quarrel with Attorney Berliner's billable rate of $265 per hour.  Nor is the Court greatly troubled by the hourly rate of Attorney Meghan Bristol ($140 per hour), an attorney with more than 3 years of experience in the field, or that of paralegal Deborah Ruel ($110 per hour).

But in light of the lack of complexity in this case, the fact that Attorney Berliner performed 25.3 hours of service as compared to Attorney Bristol's 6.4 hours of service does suggest a problem with appropriate delegation.  In cases of this type, the majority of the legal

work is consumed in the compilation of information and the preparation of documents.  The

services to be rendered by Attorney Berliner therefore ought not to have exceeded at most

one-quarter to one-third of the total.  See LaFrance, 311 B.R. at 21 ("The economics of a

Chapter 13 practice . . . require that counsel to the Chapter 13 debtor use appropriate

techniques in order to reduce the costs . . . employment of paralegals [or associate attorneys] .

. . is often a necessity.").  Because an appropriate division of labor appears not to have been

made here, the blended rate exceeded $212 per hour.  A far lesser blended hourly rate would

have been more in line with what is appropriate in this District for uncomplicated Chapter 13

cases.  And the product of that rate times the number of justifiable hours of service ought to

have avoided the need for filing a fee application under MLBR 13-7 altogether.[21]

The typical grounds justifying an upward adjustment of the lodestar do not appear here

to be present.  The case was not complicated.  The debtor presented with adequate income

and controlled expenses sufficient to satisfy his secured debt arrearages over the life of the

plan.  The Debtor's legal authority to bifurcate the automobile loan was obvious.  This is the

common stuff of Chapter 13 cases.  No special skill was required to get the job done.  There

were no difficult issues of law (excepting those unnecessarily introduced by Attorney Berliner

as further described below).  There was no evidence that other employment was passed over

by Attorney Berliner for the sake of taking on this case.  There were no time pressures unusual

when compared to the typical Chapter 13 case.  And the results were (apparently) positive, but

in no way spectacular.

Attorney Berliner disagrees.   In the Amendment, he gives three reasons why

---

[21] Of course, in some circumstances, the blended rate may be higher even in the uncomplicated case
because of the need for the greater involvement of more experienced attorneys.  But in such a case,
the additional skill should find itself reflected in a lower number of hours necessary to be expended in
order to render the same service.

"applicant's services are notably higher than the presumptive amount."  Amend. to Fee Appl.,

at 2, ¶ 4.  First:

> the need for a First Amended Plan and Amended Schedules I and J, where a
> payroll deduction was short-term but not explained by the debtor to applicant in
> the context of a need for an emergency filing within 48 hours of being retained to
> avoid a foreclosure.

Id., at ¶ 4(1).  But that is not correct.  While the Chapter 13 trustee had argued in her

September 10, 2010 Objection to Plan that the Debtor's payroll deduction had ended

prepetition and that amount should be paid into the Plan, that issue alone could have been

more easily disposed of with a far less time-consuming amendment to Schedule I and a Plan

modification.  In fact, the First Amended Plan (which was not filed until February 14, 2011) did

*not* reflect the increased income resulting from the deletion of the wage deduction, since the

Debtor also amended his Schedule J to "re-allocate" and increase his expenses.

Instead, the First Amended Plan was required to delete two of the Additional Provisions

which Attorney Berliner had inserted into the Debtor's original Plan and to which the Objection

to Plan was also targeted.  Of those added provisions, one sought to fix the amounts of

secured claims prior to the claims bar date; and the second sought a declaration that secured

claims would be deemed current on consummation of the Plan – a date 55 months away.

The Court ultimately sustained the Chapter 13 trustee's position with respect as to the

two objectionable provisions.  When the Plan was drafted, those provisions were clearly at

odds with In re Ryan, then the only case in this District on the subject.  While it is possible that

the Court would have disagreed with the Ryan holding in the Court's Euliano decision, the

likelihood that the Court would have held that an secured creditor could be bound by the

amount of the arrearage claim set forth in the Debtor's Plan, potentially confirmed months

before the bar date for filing claims, was poor.  Inclusion of the Additional Provisions was not

21

frivolous and did not violate Bankruptcy Rule 9011, but neither was there any particular reason why this Debtor required Attorney Berliner to attempt to make new law or to try to catch the Bank sleeping on its legitimate rights.  And this is particularly true here because, as described below, Attorney Berliner had reason to know that the Debtor could only provide a very rough estimate of his mortgage arrears.

The second reason given by Attorney Berliner why his "services are greater than the presumptive amount" is:

> the need for a Second Amended Plan and Amended Schedules I and J where the Court ruled against some of the proposed additional provisions for the plan in this and other cases (combining the five cases allowed for prorationing [sic] of the services over all of the cases)

Id., at 2, ¶4(2).  Frankly, this Court has no idea to what Attorney Berliner refers when he discusses the "other" cases.  The Court is dealing here only with *this* case.  But there is another problem with this second reason offered by Attorney Berliner.  He is again incorrect in his timing.  The First Amended Plan, and not the Second Amended Plan, was required by this Court's rulings on the Additional Provisions.[22]  Other than adjusting the dividend in order to take into account the claims which the Debtor had recently resolved, the real and only substantive difference between the First Amended Plan and the Second Amended Plan was the insertion of Attorney Berliner's $3,500 administrative claim.

The third reason given by Attorney Berliner why his "services are greater than the presumptive amount" is in many ways the most telling:

> . . . the need to investigate, in great detail, the 40% increase in the mortgagee's $28,000 of asserted arrears which was $8,000 greater than the debtor's $20,000 estimate, especially in the context of a United States Trustee report of inflated mortgagee claims in many Chapter 13 cases.

---

[22] The Second Amended Plan's Additional Provisions were identical to those included in the First Amended Plan.

> . . . This 44% increase required a detailed investigation by the Applicant into the claim's accuracy, especially in light of federal government reports of a high percentage of inflated mortgagee claims in Chapter 13 cases.  See, for example. CREDITOR ABUSE AND MORTGAGE FRAUD TARGETED IN NATIONWIDE SETTLEMENTS AND INTERAGENCY'SWEEP' by Clifford J. White III, Director, Executive Office for United States Trustees at Page 2 (United States Trustee Program focused on inflated mortgagee claims in Chapter 13 cases as one of three concerns during its litigation with Countrywide Home Loans, Inc. and BAC Home Loans Servicing LP) http://www.justice.gov/ust/eo/public_affairs/articles/ docs/2010/nabtalk_fall2010.pdf.
>
> The $2,453.50 value for the services related to the detailed examination of the mortgagee's claim, 44% higher than the debtor had believed, led to a $780.00[23] reduction of the claim and a net cost to the debtor of $1,673.50.  Of course, Applicant could not know the outcome of the investigation until it was completed.

Id., at 2-3, ¶4(3), (7).  But there was no real justification for this "investigation."  This Debtor did not have a clear idea of the amount of his mortgage arrearage.  A debtor's lack of certainty regarding the exact amount of mortgage arrears is commonplace in Chapter 13 cases.  A round number was used in the Debtor's Schedules and Plan – presumably the best he could do under the circumstances.  Not unexpectedly, that number was wrong, and it is this Court's experience that such estimates are frequently wrong on the low side.  When the Bank filed its proof of claim reflecting a higher arrearage amount, it was indeed Attorney Berliner's duty to inquire.  A first approach would have been to ask the lender for a copy of the Debtor's loan account and the documentation establishing the lender's claim and security interest.  If disagreement as to either the amount due or the lender's status remained, then the parties could attempt to settle their differences.  If they were unable to resolve any remaining issues, the Court would be asked to make the appropriate finding or ruling.  But that is not what happened here.  The discrepancy between the Debtor's estimate and the Bank's claim (again, a typical subject for inquiry) was transmogrified into an "investigation" wholly out of proportion to the task at hand.  Almost 10 hours were invested in this effort, and

---

[23] Attorney Berliner is actually incorrect; the claim was reduced by the amount of $962.68.

it resulted in a reduction of only $963.68 of the arrears to be paid through the Debtor's Plan against a cost of $2,453.50 in attorney fees.

Attorney Berliner says that the results of his investigation could not have been known at the outset.  But there was little, if any, evidence that the discrepancy was attributable to any inappropriate behavior by the lender.  A discrepancy alone is insufficient reason for a 10-hour inquiry.  Otherwise, every discrepancy, regardless of its size, would serve as justification for an elevated fee.  Nor was the size of the arrearage discrepancy reason enough in this case to do more at the outset than ask for the lender's accounting and copies of the loan documentation (notwithstanding Attorney Berliner's emphasis that the arrearage was reported by the lender in an amount some 40 percent higher than expected).  This Debtor believed that he was in arrears in the approximate amount of $20,000.  By virtue of Schedule J, we know that the monthly payment was in the amount of $1,572.  Accordingly, the Debtor likely believed himself in arrears for approximately 12 months of payments.  Was it so hard to believe that the size of the arrearage discrepancy was mostly attributable to the Debtor's good faith error in the number of months of non-payment or the Bank's prepetition attorney's fees?

And Attorney Berliner's analysis is flawed in a further respect.  He contends that although his "investigation" and claims objection generated $2,453.50 in attorney fees, those fees are offset by the $780 reduction in arrears to be paid through the Chapter 13 plan, lowering the net cost to the Debtor to $1,673.50.[24]  Not so.  The Debtor is required to pay no more than his monthly net disposable income of $550 into the Chapter 13 plan. That amount remained unchanged from the original Plan through the Second Amended Chapter 13 Plan

---

[24] Not only is Attorney Berliner's argument in this regard flawed, but his calculation is, as noted, inconsistent with the actual reduction in the arrearage amount by $963.68.

despite the increased arrearage amount and additional attorney fees.   Accordingly (and
ironically), payment of Attorney Berliner's additional fees would only come from the funds that
would otherwise go to the dividend for unsecured creditors.   It is *not* the Debtor, but the
*creditors*, that ultimately are being asked to pay for those unnecessary services.


IV.   CONCLUSION

The Amended Fee Application does not contain an adequate justification for the
allowance of attorney fees beyond the amounts set forth in MLBR 13-7. [25]   Attorney Berliner's
original description of his services in the Fee Application – in great respect more an
advertisement than an explication – discloses (and in some respects boasts) of redundancies.
The Court issued the May 18 Order out of concern that the unusually high fees sought by the
Attorney Berliner in this case might have resulted from the provision of services which
attorneys with similar ability (notwithstanding Attorney Berliner's views to the contrary) view as
redundant or not strictly necessary in order to render appropriate service to their clients.   The
Amendment filed in response to the Court's May 18 Order has done nothing to ameliorate that
concern.   Representation of a Chapter 13 debtor ought to be appropriately designed to meet
the debtor's goals – particularly where creditors, and not the debtor, are ultimately footing the
bill.   It is not an occasion for performing services which are redundant, nor is it a platform for
acquiring fame or fortune by exploring new areas of the law – unless the attorney attempting to
occupy that platform is willing to assume the loss if unsuccessful.

At bottom, Jose Luis Claudio, Sr.'s circumstances are unfortunate, but the legal

---

[25] The appropriateness of the amounts set forth in MLBR 13-7 is further validated by a report provided
to the Court by the Clerk's Office on the 965 cases which were filed or converted to Chapter 13 in the
Western Division of this District from September 1, 2008 through August 30, 2011.  In only 28 of those
cases filed within that three-year period (2.9 percent) did the attorney for the debtor file a fee
application seeking a fee in excess of the amounts set forth in MLBR 13-7.

assistance required to address his problems was not complicated.  The services required to lend him that assistance ought not to have consumed the time and effort which were rendered by Attorney Berliner.   Accordingly, that unnecessary expenditure of time and effort is not compensable.

The Court will award to Attorney Berliner the sum of $3,500 in compensation and reimbursement of expenses in the amount of $534.10, for a total of $4,034.10.   Because Attorney Berliner has already received from the Debtor the sum of $4,467, he has been paid an excess of $432.90.  Attorney Berliner may retain that sum in his IOLTA account unless and until services have been rendered postconfirmation in at least that amount.   See MLBR 13-7.   In the event that no such postconfirmation services are rendered, Attorney Berliner shall disgorge that excess to the Chapter 13 trustee.

An Order consistent with this Memorandum of Decision will issue forthwith.

DATED: October 13, 2011
_____
Henry J. Boroff
United States Bankruptcy Judge